FILED

2016 Jun-29  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| REGINA ROMIG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:15-cv-0158-CLS |
| | ) | |
| NEXTEK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Regina Romig, filed this action on January 27, 2015, asserting claims against Nextek, Inc., her former employer, for discriminatory treatment, discriminatory discharge, retaliatory discharge, and hostile work environment pursuant to 42 U.S.C. § 1981, and hostile work environment and discriminatory discharge pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII").[1]  The case presently is before the court on defendant's motion for summary judgment.[2]  Upon consideration of the motion, pleadings, briefs, and evidentiary submissions, the court concludes that the motion is due to be granted.

### I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 21.

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

Plaintiff, Regina Romig, began working for defendant, Nextek, Inc., on October 31, 2005, as a quality assurance inspector.[3]  Nextek has a printed policy prohibiting harassment and discrimination in the workplace.  The relevant portions provide that:

> Nextek, Inc. is committed to maintaining a work environment that is free of discrimination.  In keeping with this commitment, we will not tolerate harassment of Nextek employees by anyone, including any supervisor, co-worker, vendor, client, or customer, or visitor of Nextek or any third party.
>
> Harassment consists of unwelcome conduct, whether verbal, physical, or visual, that is based upon a person's protected status, such as sex, color, race, religion, national origin, age, physical or mental disability or other protected group status.  Nextek will not tolerate harassing conduct that affects tangible job benefits, that interferes unreasonably with an individual's work performance, or that creates an intimidating, hostile, or offensive working environment.  Such harassment may include, for example, jokes about another person's protected status, kidding, teasing or practical jokes directed at a person based on his or her protected status.

---

[3] Doc. no. 22-1 (Deposition of Regina Romig), at 34.

Doc. no. 22-3 (Nextek No Harassment Policy), at 1.  The policy also sets forth the following procedure for reporting complaints of harassment:

> All Nextek employees are responsible to help assure that we avoid harassment.  If you feel that you have experienced or witnessed harassment, you are to notify the Human Resources Manager, your supervisor or your manager.  You should report the behavior or concern even if the behavior complained of is not directed toward you.

*Id.* at 2.  Plaintiff signed a form acknowledging her receipt of a copy of the foregoing policy on November 1, 2005,[4] and testified that she was aware of the policy throughout her employment with Nextek.[5]

Plaintiff, who is white, claims that her supervisors began treating her differently in approximately 2008, because she was socializing with black co-workers.[6]  Deborah Frazier was plaintiff's supervisor during 2008 and 2009.[7]  Frazier began to say that plaintiff "couldn't do certain things that she was allowing some of the other employees to do," like using her cell phone during work hours.[8]  Frazier also regularly assigned plaintiff the most difficult work tasks, and then she strictly scrutinized plaintiff's work.[9]  Plaintiff "got in trouble" with Frazier for leaving work

---

[4] *See* doc. no. 22-3 (Nextek No Harassment Policy), at 2.

[5] Doc. no. 22-1 (Deposition of Regina Romig), at 174.

[6] *Id.* at 43-44.

[7] *Id.* at 44, 47.

[8] *Id.* at 44.

[9] *Id.* at 48-49 ("[T]hen [Frazier] was, you know, like, constantly come [*sic*] up and tell me that, you know, I was doing something wrong or having something, you know, like sitting on my

early, but when "one of the other girls" left early, "nothing was ever . . . said about it."[10]   On one unspecified day, Frazier gave plaintiff permission to leave work for approximately an hour, but when she returned, Frazier "wrote [her] up" for "job abandonment."[11]   On another unspecified day, when plaintiff returned from eating lunch with a black co-worker, Frazier did not allow plaintiff (who was not assigned to work in the shipping department) to re-enter the building through the door to the shipping department, even though Frazier "knew we always come [sic] back in through the shipping door."[12]   Frazier did, however, allow plaintiff's black co-worker to re-enter through the shipping door, because he was a shipping department employee.[13]

Despite such treatment, plaintiff never heard Frazier say anything negative about black people or others who associate with black people, and she never heard anyone else say that Frazier had made such comments.[14]   In fact, the only negative, race-related comments plaintiff ever heard while working at Nextek were from a black employee named Chris Collier, who asserted his opinion that "Nextek has

---

desk that, you know, shouldn't be there or had a board turned upside down when it should have been, you know, turned a different way on my tray.") (alterations supplied).

[10] *Id.* at 49 (ellipses supplied).

[11] Doc. no. 22-1 (Deposition of Regina Romig), at 50 (alteration supplied).

[12] *Id.* at 55-56.

[13] *Id.* at 56.

[14] *Id.* at 51-52, 55.

always been racist" because they never hired any black people to work in office-based positions, and speculated that plaintiff was being treated badly because she was associating with black employees.[15]   The record does not contain any additional evidence regarding the subject matter of Collier's comment, and the number of black employees working in Nextek's offices is not at issue in this case.

Julie Dickerson was plaintiff's supervisor during 2010 and 2011.[16]   On three or four occasions during that period, Dickerson instructed plaintiff to stop talking to her co-workers, even if the conversation was work-related.[17]   On one unspecified occasion, plaintiff stepped outside to answer a call on her cell phone, and Dickerson closed the door behind her, causing the door to lock from the inside and thereby requiring that plaintiff walk "all the way back around the building" to re-enter.[18] Even so, plaintiff never heard Dickerson make any racial comments, or observed her treating anyone differently because of his or her race.   She also never heard anyone else claim that Dickerson made racial comments.[19]

B.J. Lowery was plaintiff's supervisor from 2011 to 2013.[20]   On approximately

---

[15] *Id.* at 52-55.

[16] *Id.* at 47.

[17] Doc. no. 22-1 (Deposition of Regina Romig), at 45.

[18] *Id.* at 58.

[19] *Id.* at 59-60.

[20] *Id.* at 47.   Plaintiff testified that she did not know what the initials "B.J." stood for, *id.* at 204, and there is no other evidence of Mr. Lowery's full name in the record.

6

five or six occasions during that period, when plaintiff stopped to talk to a black machine operator named Keith Smart who also was under Lowery's supervision, Lowery would stand nearby with his arms crossed, watching the two employees engage in conversation "like he was trying to be intimidating."[21]   During the time period when plaintiff was under Lowery's supervision, she worked more overtime on Sundays than other employees, because certain other employees had lodged religious objections to being required to work on Sunday.  Plaintiff acknowledged, however, that she typically volunteered for overtime, and that she was never *required* to work Sunday overtime when she did not desire to do so.[22]   Nevertheless, plaintiff complained to Lowery on six or seven occasions that two other employees, Paulina Jackson and Bonnie Harrellson, often left early when they were supposed to be working overtime, leaving plaintiff with more than her fair share of the work.[23] Plaintiff believed there was a connection between the other employees leaving early and her own association with black co-workers, but she did not express that belief to Lowery, or to any other supervisory employee.[24]   Plaintiff never heard Lowery make any racial comments, or observed him treating anyone differently because of his or

---

[21] *Id.* at 61-63.

[22] Doc. no. 22-1 (Deposition of Regina Romig), at 64-69.

[23] *Id.* at 70-74.

[24] *Id.* at 74-75.

7

her race.  She also never heard anyone claim that Lowery made racial comments.[25]

Plaintiff acknowledged during her deposition that she was never physically threatened, humiliated, intimidated, ridiculed, or insulted by any of her supervisors or anyone else in her workplace.[26]  None of the problems she experienced at work ever prevented her from performing the duties of her job.[27]

On approximately eight or ten occasions between April and October of 2013, plaintiff noticed that Paulina Jackson and Bonnie Harrelson would have a conversation with each other when they saw plaintiff talking to black co-workers. Plaintiff could not hear what Jackson and Harrelson were saying, but she assumed they were talking about her.[28]

Plaintiff had a disagreement with Jackson on a Saturday in mid-September 2013, when she and Jackson were working overtime for a particular project.  Plaintiff observed Jackson doing work that was not related to the assigned project.  She confronted Jackson, and their conversation "got a little loud."[29]  Plaintiff also reported Jackson's work on the unrelated project to Roy Burks, the Plant Manager, who "just

---

[25] *Id.* at 77-78.

[26] *Id.* at 127, 155-57.

[27] *Id.* at 127-28.

[28] Doc. no. 22-1 (Deposition of Regina Romig), at 90-92.

[29] *Id.* at 83.

kind of shook his head and walked off and didn't say anything."[30]

During the same approximate time period, the employees in plaintiff's department were required to perform a higher than normal volume of inspections. Jackson and Harrelson, who worked in a nearby but separate department, were supposed to assist plaintiff after they had completed their own work, but "they would drag" out their own work "to keep from helping" plaintiff.[31]    Plaintiff reported that problem to B.J. Lowery, who suggested that Jackson and Harrelson move to plaintiff's work area "to make things flow better."[32]    Lowery also suggested appointing someone as a "lead" over the quality assurance department. He originally offered that position to plaintiff, but she declined it because of the conflicts she had already experienced with Jackson and Harrelson.[33]

On an unspecified date sometime during late September of 2013, plaintiff overheard a conversation between Jackson and the facility's secretary. Jackson said: "I have dealt with nasty girls before.  I know how to deal with them.  I am not — I am not that worried about it."[34]  Plaintiff did not hear Jackson mention her name, but she

---

[30] *Id.* at 79-81.

[31] *Id.* at 114-15.

[32] *Id.* at 115.

[33] *Id.* at 115-16.

[34] Doc. no. 22-1 (Deposition of Regina Romig), at 96-97.

"knew that that's what she was talking about."[35]  When Jackson returned to her work station after that conversation with the secretary, plaintiff asked Jackson if the two of them could "step outside and talk."[36]  Jackson refused, and plaintiff let her know that she had overheard what Jackson said to the secretary.  Jackson replied, "well, I didn't say anything that wasn't true."[37]

Plaintiff reported Jackson's comments to Roy Burks because she thought the relationship between her and Jackson had become "intolerable."[38]  She was frustrated because she "had been talking and talking to [Burks] about it and nothing had been done."[39]  Burks acknowledged it may have been "a bad idea" to move Jackson and Harrelson to plaintiff's work area, and he scheduled a meeting for the following week to discuss the situation.[40]  He also directed plaintiff to talk to Annette Statum, the Human Resources Manager.  Plaintiff "briefly" told Statum about her conflicts with Jackson and Harrelson.  She said "it has just been so hostile in that environment and . . . we had been talking to Roy and B.J. to try to get something done and nothing had

---

[35] *Id.* at 97.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* at 98 (alteration supplied).

[40] Doc. no. 22-1 (Deposition of Regina Romig), at 98.

been done about it."[41]   She did not, however, raise any race-related issues.[42]

The meeting that Burkes had suggested took place on October 3, 2013, and was attended by plaintiff, Kim Stovall (another employee in plaintiff's department), Jackson, Harrelson, Burks, and Statum.[43]   Plaintiff's description of the meeting in her deposition is lengthy, but the full context is important.   She testified as follows in response to the question by defendant's attorney to "take me through the meeting. What happens when the meeting starts?":

> So when the meeting started, Roy just said, you know, well, we need to have a meeting and try to figure out a way for things to start getting better in the quality department.   And everyone is — you know, we just need to get it all out in the open what is going on with everybody.   And everyone needs to be honest . . . .   Annette had said, you know, well, who — would anyone like to start?   So I did, and my — I just asked Paulina, you know, what was her problem with me?   And then she just started saying that she didn't have a problem with me, that she had already admitted to — I don't know if it was Roy or Annette that she had been, you know, that she was talking to [the secretary] that day about me and stuff.   And then she just started trying to say that she didn't have a problem at all with me or anyone else.   And that her and Bonnie had their issues worked out.   And I don't — it wasn't very long into the meeting when I — she was saying that she didn't — when she just kept saying she didn't have a problem with me, and I said, well, you know, apparently, you know you have to and I am just trying to find out what the problem — the problem is all about.   And Roy and Annette kind of just kept, you know, saying stuff like — was started attacking — well, I don't mean physically but just like, you know, saying —

---

[41] *Id.* at 135-36 (ellipses supplied).

[42] *Id.* at 136.

[43] *Id.* at 130-35.

attacking me with — well, because she said something about, well, I'm sorry, like she apologized. And then, Annette or Roy one said, well — jumped in and said, well, I don't hear — you know, you are not even attempting to try to make — you know apologize or make anything right with this. And every time I would try to say something, they would just kind of like, you know, jump in and — the meeting just kind of got turned around on me and Kim, when we were the ones that was kind of wanting to have the meeting. And then when Kim would start to say something to the effect of he had called — well, she said, I don't run around talking, you know, to everybody about people. And he just started yelling at her saying, well, that's a lie because I just overheard you talking about somebody just the other day. And she said, well, who was I supposed to have been talking about and he didn't answer. And then when I tried to say something else, before I knew it, Roy just started beating his fists on the table and saying, well, I am just — y'all will start getting along or I will wind up replacing each and every one of you, and I just broke down and started crying. And to be quite honest with you I don't — I can't even really remember a lot that was said after that, because I was just — I just kind of had — I don't know, went blank, just kind of blanked out because I was so shocked at the way Roy and Annette was acting about it. Like they kept saying, well, these two are trying — you know, they have done — they have done — you know, made things right between, you know, each other, and everybody needs to try to work together. And so when Roy started doing that, and you know, started beating his fist on the table, that just kind of — I don't know. I just kind of — I just kind of broke down and I couldn't even say anything.

Doc. no. 22-1 (Deposition of Regina Romig), at 137-40 (alteration and ellipsis supplied)

At that point, plaintiff "raised [her] hand and . . . said, " well, I just — I guess I just need to go ahead and turn my notice in."[44] After that, the other people in the

---

[44] *Id.* at 141 (alteration and ellipsis supplied).

meeting

> kept talking for a while and then when, you know, they finally concluded the meeting, when we walked out into the hall, um, Paulina turned — I looked — I told Annette, I said, can we go to your office. And she said sure, and so Paulina [Jackson] turned around and was saying, Regina, don't quit, I will behave myself, like that. And me and Annette [Statum, the Human Resources Manager,] and Kim [Stovall, another employee in plaintiff's department] was walking toward her [Annette's] office, I — because I was — I had done been crying so much I needed to blow my nose. And I said, can I stop at the bathroom, and — real quick and blow my nose? And so I walked in there, me and Kim did, and Kim was just saying, Regina, don't do this, don't do this. And so while I was in the bathroom, I said, well, you know, I am not, I can't — I can't do this. I'm just upset. By the time I made it to Regina's [*sic*: Annette Statum's] office, she had her assistant, Christine, sitting in there and she said, Annette told me to wait on you. So when Annette made it back, she just came in and said, well, I have already talked to Roy [Burks, the plant manager] and John [Roberts, Nextek's CEO], and we have decided — before I could even say anything, I mean I had done made my mind up, I knew I had just spoke out of — because I was just so upset, that, you know, I am like,  I have got a child to support. I mean, I need my insurance, I need this, I need that. I don't — you know, I just was so upset is the reason I said, you know, so I was going to tell her, I don't, you know — I don't want to quit. And she came in and said, well I have already talked to Roy and John, and we have just decided to um, just let you go ahead and — I forget the word she used, but, don't even worry about working out, working out your notice.

*Id*. at 141-43 (alterations supplied).  Plaintiff then said:

> [W]ell, wait, I was wanting to talk, you now, talk to you.  I said, I don't want to do this.  And she said, so you are saying you retract your resignation.  And I said yes.  And she said, well, I will need to go back and talk to Roy and John, and is that what you want me to do?  And I said, yes, please.  And so she said, well, wait here.  And so she walked

out of the office, stayed gone for a few minutes and came back and said she couldn't find either one of them to talk to them.  And she said, can you — this is what we will do, just go on home.  I will talk to them first thing in the morning.  Take the rest of the day off, I will go first thing in the — I will talk to them first thing in the morning and I will call you and let you know what they say.  So she called me the next day, the next morning, and said they talked about it and decided to just leave it like it was. . . . That it was in Nextek's best interest that I just didn't return.

*Id.* at 143-45 (alteration and ellipsis supplied).

The issue of race was never mentioned during the October 3rd meeting, or during any of the subsequent conversations that plaintiff had with Annette Statum.[45] Plaintiff also acknowledged that she never reported to anyone in management or in human resources that she was being treated differently because of her race, or her association with black employees.[46]

Plaintiff testified that an employee named David Matthews had previously "threatened to quit" his job, but was allowed to continue working.[47]  She did not know any of the circumstances surrounding Matthews's threat, and she was not aware of any other employees who either had threatened to quit, or who actually did quit, but then were allowed to return to work.[48]

Plaintiff filed a charge of discrimination with the Equal Employment

[45] *Id.* at 155.
[46] Doc. no. 22-1 (Deposition of Regina Romig), at 129-30, 175.
[47] *Id.* at 154.
[48] *Id.* at 154-55.

14

Opportunity Commission on January 6, 2014, stating:

> I began my employment during October 2005 in the position of quality assurance.  I recently returned to work from a short illness.  Recently, I have had some problems from two female employees who were not pulling their weight.  I reported the two employees and the supervisor said he would speak with them.  During a meeting held with the two female employees, they were told they were going to be reprimanded for failure to work over time.  A subsequent meeting was held with the manager, the two employees, along with me.  The supervisor became upset, beat his fist on the table and threatened to replace everyone.  At the meeting, things seemed to turn toward me as being the problem. As the meeting escalated, I became upset and offered my two week notice.  The human resources manager readily accepted my two weeks' notice and agreed to pay me rather than allow me to work the notice out.  I made every attempt to rescind my notice but the employer refused to allow me to rescind my resignation.
>
> I believe I have been discriminated against because of my association with employees of a different race, more specifically, Black employees in violation of Title VII of the Civil Rights Act of 1964, as amended.  One of my friends also has a biracial child.  I also believe I was subjected to retaliation for complaining of the two White females.  I do know of one White female who had so many arguments with employees that the company put her in her own cubicle.

Doc. no. 32, at ECF 1-2 (EEOC Charge).  The EEOC issued a Dismissal and Notice of Rights on October 27, 2014, informing plaintiff that it was unable to find any statutory violations, and that she had the right to file a lawsuit in state or federal court.[49]

## III. DISCUSSION

---

[49] *See* doc. no. 32, at ECF 4.

A.      **Hostile Work Environment**

Plaintiff contends that "Defendant engaged in illegal discrimination on the basis of the Plaintiff's race and/or association with another particular race by creating a hostile work environment and allowing it to persist during the Plaintiff's employment."[50]   She asserts that claim pursuant to both Title VII and 42 U.S.C. § 1981, which "have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (ellipsis supplied).

Plaintiff must provide proof of five elements in order to establish a *prima facie* racially-hostile work-environment claim:  (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a discriminatory abusive working environment; and (5) her employer is liable for the environment under a theory of either direct or vicarious liability.  *See, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

The Eleventh Circuit has recognized claims for hostile work environment based upon an employee's association with persons of the opposite race.  *See Tomczyk v.*

---

[50] Doc. no. 1 (Complaint), at ¶¶ 25, 28.

*Jocks & Jills Restaurants, LLC.*, 198 F. App'x 804, 809 (11th Cir. 2006) (citing *Parr v. Woodmen of the World Life Insurance Co.*, 791 F.2d 888, 890-92 (11th Cir. 1986)) ("[H]arassment based on an interracial relationship is forbidden under Title VII.") (alteration supplied).  Thus, even though plaintiff is not alleging harassment based upon her *own* race, she still belongs to a group of persons protected by both Title VII and § 1981.  Moreover, it is clear that she was subjected to behavior that she found to be unwelcome.

Even so, it would require a strained construction of the evidence in this case to conclude that the unwelcome behavior complained of by plaintiff was actually caused by her association with black employees.  There is no evidence that any of plaintiff's supervisors or co-workers made negative comments about black people, or about white people who associate with black people.  Plaintiff has not identified any situations in which white people who did not associate with black people were subjected to more favorable treatment.  Admittedly, she does claim that she was not allowed to re-enter the Nextek facility through the shipping department door after returning from lunch with a black co-worker, but any race-based animus that might be inferred from that action is undermined by the fact that plaintiff's black co-worker, *who was a shipping department employee*, was allowed to re-enter the workplace through the shipping department door.  Plaintiff also claims that B.J. Lowery

sometimes stood nearby watching, with his arms crossed, when she had a conversation with a black co-worker, but there is no evidence that Lowery's reaction was based upon the race of the two employees, rather than on the fact that the two employees, both of whom were under Lowery's supervision, should have been working instead of talking. Finally, plaintiff claims that Paulina Jackson and Bonnie Harrelson often said something to each other when they observed her talking to black co-workers, but she offers nothing beyond her own subjective speculation that the two women's reaction had anything to do with race, or even that the women actually were talking about her. The other alleged instances of harassment about which plaintiff complains — from not being allowed to use her cell phone at work, to being assigned more difficult work tasks, to being required to work overtime hours — have nothing whatsoever to do with either plaintiff's own race, or the race of the co-workers with whom she associated. Any race-based connection arises purely from plaintiff's own conjecture, and that is not enough to support a claim under either Title VII or § 1981. *See Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (holding that an employee's opinion that she has been discriminated against, "without more, is not enough to establish a prima facie case of race discrimination").

Plaintiff also cannot prove that the harassment she allegedly endured was sufficiently severe or pervasive to alter the terms and conditions of her employment.

18

The "severe or pervasive" element contains both an objective and a subjective component.  To satisfy this element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and* that a reasonable person also would perceive it as such.  *See, e.g.*, *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993).

When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance.  *See, e.g.*, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (citing *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999)).  It is not necessary to prove each of the factors individually.  However, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment and created a working environment that a reasonable person would find discriminatorily abusive.  *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citations omitted).

Here, the behavior to which plaintiff was subjected, taken as a whole, simply does not add up to a hostile and discriminatorily abusive work environment.  As an

initial matter, the severity factor does not weigh heavily in plaintiff's favor, because any connection between the behavior to which plaintiff was subjected and either plaintiff's race, or the race of the people with whom she associated, is tenuous at best. Further, with regard to the frequency factor, the conduct about which plaintiff complains occurred only sporadically over the course of approximately six years. Finally, and importantly, plaintiff acknowledged during her deposition that she never felt threatened or humiliated,[51] and that the alleged harassment never prevented her from performing her job duties.[52]

Because plaintiff cannot establish all the elements of a *prima facie* case, her claim for a race-based hostile work environment must fail.

## B.   Race-Based Discriminatory Treatment

Plaintiff asserts, pursuant to § 1981, that defendant "engaged in illegal discrimination by treating the Plaintiff differently on the basis of the Plaintiff's race and/or association with a particular race."[53]   She also asserts, pursuant to both § 1981 and Title VII, that defendant "engaged in illegal discrimination by discharging the Plaintiff on the basis of the Plaintiff's race and/or association with a particular race."[54]

---

[51] Doc. no. 22-1 (Deposition of Regina Romig), at 127, 155-57.

[52] *Id.* at 127-28.

[53] Doc. no. 1 (Complaint) ¶ 16.

[54] *Id.* ¶¶ 19, 31.

20

Plaintiff does not claim to have direct evidence of a race-based discriminatory animus. Therefore, she must prove her claim with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination. To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-56.

To establish a *prima facie* case of race-based discrimination, plaintiff must show that: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) the employer replaced her with someone outside her protected class or otherwise treated similarly situated employees outside her protected class more favorably, and (4) he was qualified to perform the duties of her job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Nix v. WLCY*

*Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).

As discussed in the previous section, plaintiff was a member of a protected class because of her association with persons of the opposite race. There also is no dispute with regard to plaintiff's qualifications. The other elements of the *prima facie* case, however, require closer consideration.

It is clear that nothing even approaching an "adverse employment action" occurred until plaintiff's employment ended. Although the Eleventh Circuit has "never adopted a bright-line test for what kind of effect on the plaintiff's 'terms, conditions, or privileges' of employment the alleged discrimination must have for it to be actionable," it has clarified that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1238 (11th Cir. 2001). Indeed, "[a]lthough the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id*. at 1239 (alteration supplied). Thus, "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Id*. (emphasis omitted). "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in

22

the circumstances." *Id*. None of the events that occurred before plaintiff's last day on the job had any tangible adverse effect on her employment.

It also is clear that plaintiff's employment was not actually *terminated*. Instead, she *resigned* her employment during the October 3, 2013 meeting. To the extent plaintiff claims that she was constructively discharged, she has not offered the evidence necessary to support such a claim. "To successfully claim constructive discharge, a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'" *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997) (quoting *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)). Additionally, a plaintiff "must do more than merely show that she was subjected to actionable harassment," because "'[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment.'" *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)) (alteration supplied). This court previously found that plaintiff cannot establish a hostile work environment claim; accordingly, she also cannot establish a constructive discharge claim.

Thus, plaintiff is left only with the theory that she was discriminated against

when defendant failed to allow her to withdraw her resignation, or re-hire her after accepting her resignation. That can be considered an adverse employment action, because it had a tangible effect on plaintiff's employment. Even so, plaintiff cannot prove that the employment decisions (*i.e.*, not allowing her to withdraw her resignation, or failing to re-hire plaintiff after accepting her resignation) were made because of a race-based animus. She has offered no evidence that similarly situated employees who did *not* associate with black co-workers were allowed to resign their positions, but then either withdraw their resignations after changing their minds, or were re-hired after resigning. As such, all of her claims for race-based discrimination must fail.

## C.    Retaliation

Plaintiff asserts, pursuant to § 1981, that defendant "terminated [her] employment because of [her] objection to the Defendant's discriminatory treatment."[55]  Generally speaking, a plaintiff must prove three elements to establish a *prima facie* case of retaliation:  (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action.  *See, e.g.*, *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002);

---

[55] *Id.* ¶ 22 (alteration supplied).

*Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

"Statutorily protected expression includes filing complaints with the EEOC and complaining to superiors about sexual harassment." *Johnson*, 234 F.3d at 507 (citing *Rollins v. State of Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989)).   Plaintiff filed her EEOC charge on January 6, 2014, *after* her employment with Nextek already had ended.   Therefore, plaintiff cannot claim that she was retaliated against for filing an EEOC charge.   Plaintiff also made informal complaints to her supervisors about work assignments and her co-workers' behavior, but she never made a complaint that she was being treated differently *because of race*, or *because of her association with black employees*.   "Unfair treatment, absent discrimination based on race, sex, or national origin, is *not* an unlawful employment practice under Title VII." *Coutu v. Martin County Board of County Commissioners*, 47 F.3d 1068, 1074 (11th Cir. 1995) (emphasis in original).   Accordingly, those complaints cannot serve as the basis for a retaliation claim under either Title VII or § 1981.   Because plaintiff has not demonstrated that she engaged in statutorily protected expression, her retaliation claim also must fail.

### IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion for summary judgment

is GRANTED, and all claims embraced in plaintiff's complaint are DISMISSED with prejudice.[56]  Costs are taxed to plaintiff.  The Clerk is directed to close this file.

      **DONE** and **ORDERED** this 29th day of June, 2016.

                                            United States District Judge

---

[56] Because summary judgment is due to be entered on the merits, there is no need to consider defendant's arguments regarding the *Farragher-Ellerth* affirmative defense and collateral estoppel. *See* doc. no. 21 (Motion for Summary Judgment and Supporting Brief of Defendant Nextek, Inc.), at 24-29.

26